UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.M., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br><br>Defendant. | Case No. 13-cv-00286-JCS<br><br>**ORDER GRANTING PETITIONERS'<br>MOTION FOR SUMMARY JUDGMENT<br>AND DENYING COMMISSIONER'S<br>MOTION FOR SUMMARY JUDGMENT**<br><br>**Dkt. Nos. 19, 28** |

## I.   INTRODUCTION

In this Social Security case, the minor children of the deceased Emilio Barla Mendoza (hereafter, "Petitioners"), through their mother and *guardian ad litem* Sandra Juaregui, appeal the Commissioner of Social Security's decision denying benefits to claimant Emilio Barla Mendoza. Petitioners and the Commissioner filed Motions for Summary Judgment.  For the reasons stated below, the Court GRANTS Petitioners' Motion for Summary Judgment and DENIES the Commissioners' Motion for Summary Judgment.[1]

## II.   BACKGROUND

### A.   Procedural History

In May of 2009, Mendoza filed applications under Titles II and XVI of the Social Security Act for disability insurance benefits and supplemental security income benefits alleging a disability onset date of June 7, 2005.  Administrative Record ("AR") 24.  The claims were initially denied on September 23, 2009, and were denied again upon reconsideration on April 22, 2010.  *Id.* Mendoza requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

---

[1]  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court<br>Northern District of California

1   April 27, 2011 in Monterey, California.  *See* AR 61-88 (Transcript).  On May 13, 2011, the ALJ

2   denied Plaintiff's application for benefits.  *See* AR 24-33 (ALJ's decision).  Mendoza sought

3   review of the ALJ's decision by the Appeals Council.  The Appeals Council denied review on

4   June 18, 2012, making the ALJ's decision the final decision of Commissioner for purposes of

5   judicial review.  *See* 42 U.S.C. § 405(g).

6        Mendoza died on July 16, 2012.  AR 4.  Mendoza's minor children appealed the decision

7   of the Commissioner denying Mendoza's benefits under 42 U.S.C. § 405(g).

8        **B.    Administrative Record**

9            **1.    Evidence relating to Mendoza's Physical Impairments**

10       Mendoza is a Hispanic male.  He left school in the 11th grade.  At the time of the hearing

11  before the ALJ on April 27, 2011, Mendoza was 36-years-old and lived with his mother.  He

12  testified that he could not work due to his chronic back pain.  *Id*. at 67.  Mendoza explained that,

13  for the three years prior to his injury, he held two jobs to support his family.  *Id*. at 73.  He worked

14  at an auto body repair shop during the day, and as a caretaker for his brother-in-law with cerebral

15  palsy by night.  *Id*.  Mendoza testified that he was injured in 2003 when his brother-in-law had a

16  seizure and fell on him, causing Mendoza to slam his back against the bath tub.  *Id*.

17       Mendoza's last day of work was June 7, 2005.  AR 65.  When asked why he stopped

18  working two years after his injury in 2003, Mendoza explained that he had been taking a lot of

19  narcotics, to which he became addicted, and could no longer work with the pain and being on

20  heavy medication.  *Id*. at 70.  Mendoza testified that his inability to work eventually led to his

21  divorce in 2006.  AR 72.  After his divorce, he went to live with his mother, who did everything

22  for him in terms of preparing meals, paying bills, and doing chores around the house.  *Id*.

23       Mendoza's mother submitted a function report noting her observations of Mendoza's daily

24  activities and the limitations caused by his impairments.  *See* AR 164-71.  Ms. Mendoza wrote that

25  Mendoza's injury "change[d] his [w]hole life."  *Id*.  She wrote that Mendoza could neither sit nor

26  stand for too long due to his pain, and that Mendoza only left the house for his occasional walk,

27  which depended on his level of pain.  *Id*. at 167.  Mendoza could not leave the house

28  unaccompanied because Mendoza's left leg would give out.  *Id*. at 167.  Mendoza would watch

United States District Court
Northern District of California

1   TV and sleep most of the day.  *Id*.  Mendoza could primarily take care of his own personal

2   hygiene, but his mother had to help him pull over his shirt.  *Id*. at 165.

3          On August 5, 2005, Mendoza began to receive treatment for his chronic back pain from a

4   neurologist, Gerald F. Wahl, M.D.  AR 226-28.  After his first visit, Dr. Wahl wrote that given the

5   long period of time since Mendoza's injury, his "symptoms seem a bit in excess of that

6   anticipated," but Dr. Wahl still recommended that Mendoza undergo a MRI.  *Id*. at 228.  The MRI

7   was taken of Mendoza's cervical and lumbar areas, but the MRI did not reveal any abnormalities.

8   *Id*. at 229-30.

9           To treat his back injury, Mendoza saw Dr. Wahl every three months for the next five

10  years.  AR 238-63, 427-34.  After each visit, Dr. Wahl prepared a brief letter which was sent to the

11  State Compensation Insurance Fund.  *See id*.  A review of these letters shows that Mendoza's back

12  pain continued without improvement.  Dr. Wahl consistently reported that Mendoza had moderate

13  restrictions in flexion and tenderness in the paravertebral muscles, but also wrote that he observed

14  no direct spasm, no nerve root compression, and no weakness or sensory loss.  *See id*.  In the

15  ALJ's words, Dr. Wahl was "very conservative" in prescribing medication for Mendoza and

16  would recommend stretching and other light forms of exercise.  *See id*.

17         At the hearing before the ALJ, Mendoza also testified about his history having an addiction

18  to alcohol, which he used to self-medicate his back pain for some period of time.  AR 71.

19  According to Mendoza, his alcohol consumption caused him to develop pancreatitis and secondary

20  diabetes mellitus around December 2009.  *Id*.; *see also* AR 425 (Mendoza reported drinking 30

21  beers a day for three years).  At this time, Mendoza decided to stop drinking and deal with the

22  pain, which he said was "pretty hard."  AR 72.  Mendoza testified that his diabetes was "under

23  control."  AR 84.

24         According to Mendoza, his injury got worse in June 2010 when the pain started going

25  halfway down the side of his left leg.  AR 75.  His left leg would give out while he was walking,

26  causing him to tip over.  AR 75.  Dr. Wahl prescribed a cane for Mendoza on June 4, 2010, which

27  Mendoza testified to using every day.  AR 76, 441.  To relieve the pain associated with the "flare

28  ups" of his pain, Mendoza also started going to the emergency room "two or three times out of the

United States District Court
Northern District of California

3

1    month," where he would be given narcotics such as Demerol and Morphine.  *See* AR 77.

2         On July 25, 2010, Dr. Wahl wrote in his letter that "[t]here is no reason [Mendoza] should

3    be going to the emergency room to obtain pain medications since his condition is obviously

4    longstanding and chronic."  AR 430.  Dr. Wahl added that Mendoza "is not to exceed the doses of

5    medications prescribed by myself."  *Id*.  Although Dr. Wahl indicated that he would discuss this

6    matter with Mendoza at the next visit, hospital records show that Mendoza continued to go to the

7    emergency room on a regular basis through February 2011.  *See* AR 430, 351-413.

8         Dr. Wahl completed a Residual Functional Capacity ("RFC") questionnaire on May 25,

9    2010 and another RFC on May 10, 2011.  AR 338-43, 444-48.  A RFC is "the most you can still

10   do despite your limitations."  20 C.F.R. § 404.1545(a)(1), § 416.945(a)(1).  In both RFC

11   questionnaires, Dr. Wahl opined that Plaintiff could sit without interruption only for one hour, and

12   that in an 8-hour workday, Mendoza could sit for less than two hours and stand/walk for less than

13   two hours.  AR 340-41, 445-46.  Dr. Wahl also wrote that Mendoza could stand for one hour in

14   the 2010 RFC, but this was reduced to 15-20 minutes in the 2011 RFC.  AR 341, 446.  In both

15   RFCs, Dr. Wahl wrote that in any job, Mendoza would require the option to sit or stand at will,

16   would have to take unscheduled breaks, and would be absent from work more than four days per

17   month as a result of his impairments.  *Id*. at 342-43.

18                    **2.      Evidence relating to Mendoza's Mental Impairments**

19        At the hearing before the ALJ on April 27, 2011, Mendoza briefly testified to his "anxiety

20   attacks," which had developed since his back injury.  AR 74.  Mendoza stated that some nights, he

21   was unable to sleep, and that he often had panic attacks in the morning when he woke up.  *Id*. at

22   82-82.  Mendoza testified that medicine prescribed by his psychiatrist, Marshall Blatt, M.D.,

23   which consisted of both Symbyax and Xanax, helped him sleep and helped with his mood.  *Id*.

24   Mendoza's mother also wrote in her function report that her son "is very depress[ed]" and "is on

25   meds for that."  AR 164.

26        Mendoza saw Dr. Blatt on a pro bono basis starting on June 14, 2010 through at least

27   February 10, 2011.  *See* AR 414-26.  After their first visit, Dr. Blatt reported that Mendoza had a

28   "history of major depressive disorder" and "significant problems with access to healthcare," but

United States District Court
Northern District of California

had "never had a psychiatric hospitalization or frank suicide attempt." AR 425. After every visit, Dr. Blatt would consistently report that Mendoza had a "dual diagnosis"−meaning that Mendoza suffered from both substance abuse and mental illness. Dr. Blatt also consistently wrote, however, that Mendoza was sober and had been for some time. *See id*.

In July and August of 2010, Dr. Blatt reported that Mendoza probably suffered from bipolar disorder. AR 422-23.[2] Dr. Blatt frequently described Mendoza as a "sad looking" and "dysphoric" individual. *See, e.g.*, AR 417. Mendoza would discuss with Dr. Blatt about his problem being unable to see his children since his divorce. *See, e.g.*, 419, 421. Dr. Blatt recommended that Mendoza read a book, *The Four Agreements*. *Id*. at 420.

At their meeting, Mendoza informed Dr. Blatt that he had stopped taking Xanax previously because of its expense. AR 425. Dr. Blatt wrote a new prescription for Xanax and instructed Mendoza to retrieve the pills at Costco, where he could get 100 one milligram pills for $10. *Id*. Because Mendoza also informed Dr. Blatt about his history of substance abuse, Dr. Blatt instructed Mendoza's mother to manage the Xanax and limit Mendoza's intake to 14 pills per week. *Id*. However, on the next visit on June 30, 2010, Mendoza reported having taken 100 pills of Xanax in less than two weeks, and said that he "felt like a junkie." *Id*. at 424. On the next visit on July 22, 2010, Mendoza told Dr. Blatt that he was wrong at the previous meeting when he had told Dr. Blatt he used all his Xanax. *Id*. at 423.

Dr. Blatt continued to instruct Mendoza's mother to manage Mendoza's Xanax intake. *See* AR 417, 420. On December 1, 2010, after learning that Mendoza had increased his dosage of Xanax from two pills to three pills per day without prior consultation, Dr. Blatt discussed the habit-forming nature of Xanax and switched Mendoza's prescription from Xanax to Klonopin. AR 425. The Klonopin apparently caused Mendoza "to go into a rage" and he was seen in the emergency room on January 8, 2011. AR 415. Dr. Blatt worried that Mendoza took more than the prescribed amount of Klonopin−he wrote in his report: "the good lord knows how much he

_____

[2] On July 22, 2010, Dr. Blatt reported that Mendoza had a "history of probable bipolar depression." *Id*. at 423. On August 18, 2010, Dr. Blatt wrote that Mendoza "probably has bipolar disorder or major depressive disorder," which was "severe." AR 422.

United States District Court
Northern District of California

1    actually took." *Id*. On January 11, 2011, Mendoza had an appointment with Dr. Blatt, but left

2    abruptly at the beginning of the interview. *Id*. Dr. Blatt told Mendoza's mother he was unsure if

3    he wanted to continue seeing Mendoza due to his inability to follow the treatment plan. *Id.* at 415.

4    At the next visit on February 10, 2011, Mendoza apologized for his behavior. *Id*. at 414.

5            Dr. Blatt submitted a letter dated January 26, 2011 to the Social Security Administration,

6    in which he opined that Mendoza seemed unlikely to be able to return to work due to his

7    psychiatric condition. AR 350. Dr. Blatt believed this was reflected in the medical record. *Id*.

8            On April 11, 2011, Dr. Blatt completed a full RFC questionnaire regarding limitations

9    arising from Mendoza's mental impairments. AR 435-40; *see also* 344-49 (first RFC completed

10   on December 15, 2010). Dr. Blatt diagnosed Mendoza with bipolar syndrome and gave him a

11   "guarded" prognosis with a Global Assessment of Functioning ("GAF") score of 55.[3] AR 435.

12   Dr. Blatt noted that Mendoza had decreased energy, thoughts of suicide, mood disturbance,

13   pathological dependence, passivity or aggressivity, substance dependence, intense and unstable

14   relationships and impulsive and damaging behavior. AR 436-37. Dr. Blatt wrote that Mendoza's

15   depression made the symptoms from his physical impairments worse. *Id*. at 439. Dr. Blatt

16   reported that Mendoza would be seriously limited in most tasks and requirements associated with

17   unskilled work. *Id*. at 437-38. Dr. Blatt anticipated that Mendoza would miss more than four days

18   per month due to his impairments. *Id*. at 439-40. Dr. Blatt noted that the earliest date these

19   limitations apply was June 14, 2010. *Id*. at 440.

20           On August 15, 2009, almost one year *before* Mendoza began to see Dr. Blatt, Mendoza

21   underwent a psychiatric evaluation by a licensed psychologist, Dr. Scaramozzino, PhD. AR 284-

22   89. Mendoza reported to Dr. Scaramozzino that he could not go back to work because of his

23   chronic back pain. AR 284. Dr. Scaramozzino diagnosed Mendoza with a pain disorder

24   associated with both psychological factors and a general medical condition, as well as an

25   _____

26           [3] "A GAF score is a rough estimate of an individual's psychological, social, and
     occupational functioning used to reflect the individual's need for treatment." *Keyser v. Comm'r*
27   *Soc. Sec. Admin.*, 648 F.3d 721, 728 (9th Cir. 2011) (quoting *Vargas v. Lambert,* 159 F.3d 1161,
     1164 n. 2 (9th Cir. 1998)).
28

United States District Court
Northern District of California

adjustment disorder for a depressed mood.  *Id*. at 288.  Dr. Scaramozzino wrote that "[t]here did not appear to be any evidence of the claimant exaggerating symptoms," but also believed that Mendoza's "symptom severity is considered to be at the low end of the mild range."  *Id*.  He wrote that there was a fair likelihood that Mendoza's mental state would improve within one year, as it was primarily caused by his back pain which reduced his level of functioning.  *Id*.  Dr. Scaramozzino gave a functional assessment of Mendoza's psychiatric condition, writing that Mendoza's daily activities, social functioning and work activities such as following directions, maintaining concentration, etc., would not be significantly impaired from a psychological perspective.  *Id*. at 288-89.  Dr. Scaramozzino opined that the likelihood of Mendoza "emotionally deteriorating in the work environment is fair" because of Mendoza's chronic pain, reduced level of functioning, and depressed mood.  *Id*. at 289.

### C.       Standard for Determining Disability

A person is "disabled" for purposes of receiving Social Security benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Social Security disability cases are evaluated using a five-step, sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920.  The Ninth Circuit has succinctly described this five-step process as follows:

> Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations.  Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities.  Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix.  Benefits are awarded at step three if claimants are disabled.  Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work.  Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government.  Claimants not disqualified by step five are eligible for benefits.

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003)

United States District Court
Northern District of California

**D.     The ALJ's Decision**

In the first four steps of the analysis, the ALJ found (1) that Mendoza had not engaged in substantial gainful activity since June 7, 2005, (2) that Mendoza's back and neck pain qualified as a "severe" impairment, (3) that Mendoza's impairments did not meet any listing in 20 C.F.R. Part 404, Subpart B, Appendix 1, and (4) that Mendoza could not perform any past relevant work.  The ALJ nonetheless found that Mendoza was capable of performing the full range of sedentary work, and therefore, found that Mendoza was not disabled at step five of the analysis because Mendoza was capable of performing jobs that exist in significant numbers in the national economy.  AR 32.

The RFC of sedentary work is defined in the Code of Federal Regulations:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  In finding that Mendoza was capable of the full range of sedentary work, the ALJ partially discredited Mendoza's complaints of pain.  The ALJ wrote that Mendoza's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  AR 29.

As reasons for partially discrediting Mendoza, the ALJ noted that Mendoza had initially been denied disability in 2000 but continued to work after that time, which the ALJ believed "calls into question" Mendoza's credibility.  AR 31.  The ALJ also believed that a report from the emergency room of Mee Memorial Hospital showing that Mendoza had injured himself while "lifting boxes" was "drastically inconsistent" with Mendoza's statements regarding his immobility.  AR 32, 411.  The ALJ noted that Mendoza's x-rays taken in 2010 did not show any abnormalities, which was consistent with the lack of objective medical evidence.  *Id*. at 32.  The ALJ also mentioned the fact that Dr. Wahl had not been aware that Mendoza had prescribed narcotics during his emergency room visits.  *Id*

The ALJ also gave "very little weight" to the third-party function report submitted by Mendoza's mother, who lived with and cared for Mendoza since 2006. AR 31. The ALJ wrote that Mendoza's mother mentioned in the function report that Mendoza was losing his eye sight in his left eye, but this was not corroborated by any medical evidence. The ALJ also believed Ms. Mendoza was an "advocate" for Mendoza given her personal interest in Mendoza's case. *Id.*

In support of the conclusion that Mendoza had a RFC of sedentary work, the ALJ relied on reports from medical consultants who reviewed Mendoza's medical records. On August 24, 2007, Keith M. Quint, M.D. reviewed Mendoza's medical records and concluded that Mendoza could do light work. AR 236-37. On April 5, 2010, Dr. Quint again reviewed Mendoza's medical records and determined that he could medium work with limited balancing. AR 333-37. On April 19, 2010, R. Paxton M.D., in conjunction with Dr. Quint, also gave Mendoza a medium RFC. AR 330-32. The ALJ also gave "great weight" to the opinion of Dr. Scaramozzino because his opinion "corresponds to the claimant's medical history and echoes various other opinions…." AR 27.

The ALJ also purported to give "great weight" to the treatment notes of Dr. Wahl. AR 29; *see also* AR 238-63, 427-34. Nevertheless, the ALJ gave "very little weight" to Dr. Wahl's RFC questionnaires, which indicated that Mendoza was not capable of performing a sedentary job. The ALJ believed this "did not correspond with his own treatment notes … where the only limitation he put on the claimant was in regard to heavy lifting, and twisting." AR 31. The ALJ also discounted Dr. Wahl's opinion because he "apparently relied quite heavily on the subjective report of symptoms and limitations" provided by Mendoza, which the ALJ did not believe to be entirely credible.

The ALJ also gave "very little weight" to the RFC questionnaire completed by Mendoza's treating psychiatrist, Dr. Blatt. AR 30. The ALJ wrote that Dr. Blatt's opinion "contrasts sharply with the other evidence of record," and was "without substantial support from the other evidence of record," which made it less persuasive. *Id.* The ALJ did not specify which evidence contradicted Dr. Blatt's assessment. The ALJ mentioned that Dr. Blatt's opinion would be accorded less weight because the ALJ believed Dr. Blatt acted as an "advocate" for Mendoza on

9

1   account of his having recommended a book called "Four Agreements," and having discussed

2   Mendoza's child custody issues.  AR 31, AR 420.

3   **III.    LEGAL STANDARD**

4          Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's

5   decision denying benefits to Mendoza.  The ALJ's decision must be affirmed if its findings are

6   supported by substantial evidence and grounded upon correct legal standards.  *Moncada v. Chater,*

7   60 F.3d 521, 523 (9th Cir. 1995); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  In this

8   context, the term "substantial evidence" means "more than a mere scintilla but less than a

9   preponderance—[it] is such reasonable evidence that a reasonable mind might accept as adequate

10  to support the conclusion."  *Moncada*, 60 F.3d at 523; *see also Drouin*, 966 F.2d at 1257.  When

11  determining whether substantial evidence exists to support the ALJ's decision, the Court examines

12  the administrative record as a whole, considering adverse as well as supporting evidence.  *Drouin,*

13  966 F.2d at 1257; *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir. 1989).  Where evidence exists

14  to support more than one rational interpretation, however, the Court must defer to the ALJ's

15  decision.  *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

16  **IV.    DISCUSSION**

17         Petitioners argue that the ALJ's decision that Mendoza is not disabled should be reversed

18  for five reasons.  First, Petitioners argue that the ALJ erred in rejecting the opinions of Mendoza's

19  treating physicians, Dr. Wahl and Dr. Blatt, who both completed RFC questionnaires indicating

20  that Mendoza was capable of less than a sedentary RFC.  Second, Petitioners contend that the ALJ

21  failed to consider all of Mendoza's impairments when determining the RFC, including Mendoza's

22  psychiatric condition and diabetes.  Third, Petitioners argue that the ALJ's adverse credibility

23  finding is not supported by substantial evidence.  Fourth, Petitioners argue that the ALJ erred in

24  rejecting the third-party assessment from Mendoza's mother.  Finally, Petitioners argue that

25  testimony of the vocational expert establishes Mendoza's entitlement to benefits.

26  //

27  //

28  //

United States District Court
Northern District of California

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**A.** **Whether the ALJ's Erred in Partially Discrediting Mendoza's Complaints of Pain**

The ALJ found that Mendoza's complaints of pain and other symptoms were not credible to the extent they were inconsistent with a sedentary RFC.  Petitioners contend that the ALJ's adverse credibility finding is not supported by substantial evidence.

Determining whether a claimant's testimony regarding subjective pain or symptoms is credible entails a two-part process.  The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotation marks omitted).  In this case, the ALJ found that Mendoza's impairments "could reasonably be expected to cause the alleged symptoms," AR 32, and therefore, proceeded to the second step of the credibility determination.

At this next step, if there is no evidence of malingering (as is the case here), "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Id.* at 1283-84.  "[A]n adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain."  *Bunnell*, 947 F.2d at 345 (9th Cir. 1991).

The ALJ noted a few specific reasons for partially discrediting Mendoza's complaints of pain.  First, the ALJ noted that Mendoza was initially denied benefits in January 2000 due to insufficient evidence, but continued to work after that time, which "calls into question his credibility."  AR 31.  Second, the ALJ noted that on June 2, 2010, Mendoza went to the emergency room at Mee Memorial Hospital and reported that he had "been lifting boxes."  AR 32, 411.  The ALJ believed this was "drastically inconsistent" with Mendoza's complaints of pain and immobility.  *Id.* at 32.  The ALJ also noted that x-rays Mendoza had taken of his lumbar spine, thoracic spine and left shoulder on June 21, 2010 in the emergency room did not show any abnormality.  *Id.*  In addition, the ALJ remarked that Dr. Wahl's notes revealed that he was

1   unaware Mendoza was prescribed narcotics such as from the emergency room in the summer of

2   2010.  AR 32.

3           Petitioners argue that the ALJ's credibility finding was improper, and specifically

4   challenge the ALJ's reliance on the emergency room report on June 2, 2010, which notes that

5   Mendoza was "lifting boxes."  The Court agrees that the "lifting boxes" notation fails to discredit

6   Mendoza.  The fact Mendoza reported having injured himself after lifting boxes is not "drastically

7   inconsistent" with the record, which shows that Mendoza suffered from chronic back pain for a

8   number of years.  Nor is it inconsistent with Mendoza's representations regarding his immobility.

9   Mendoza did not testify that he never lifted boxes since the date of his injury; rather, he testified in

10  general terms that his back pain prevented him from carrying out his daily activities, including

11  leaving the house unaccompanied.  To the extent the ALJ believed that lifting boxes on this one

12  occasion discredited Mendoza's testimony, the ALJ should have questioned Mendoza and

13  developed the record in this regard.

14          Nevertheless, even disregarding the ALJ's reliance on the "lifting boxes" notation from the

15  emergency room records, the Court does not find that the ALJ committed legal error by partially

16  discrediting Mendoza's complaints of pain.  Petitioners have not argued that the ALJ improperly

17  relied on the fact Mendoza had previously been denied disability yet continued to work, the fact

18  there was little objective medical evidence supporting Mendoza's complaints, or the fact Mendoza

19  was not entirely honest with Dr. Wahl about the prescription narcotics he received in the

20  emergency room.  The Court finds that these constitute clear, specific and convincing reasons to

21  partially discredit Mendoza's subjective complaints of pain.  *Smolen*, 80 F.3d at 1281.

22  Accordingly, the Court finds no error with the ALJ's credibility determination.

23          **B.      Whether the ALJ Considered the Lay Opinion of Mendoza's Mother**

24          "In determining whether a claimant is disabled, an ALJ must consider lay witness

25  testimony concerning a claimant's ability to work."  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th

26  Cir. 2009) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006)); *see also* 20 C.F.R. §§

27  404.1513(d)(4), (e).  The Ninth Circuit has long recognized that "friends and family members in a

28  position to observe a claimant's symptoms and daily activities are competent to testify as to her

United States District Court
Northern District of California

1    condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  Thus, "the ALJ can reject the

2    testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he

3    rejects." *Smolen*, 80 F.3d at 1289.

4            Mendoza's mother submitted a third-party function report which indicated that Mendoza's

5    back pain was debilitating and prevented him from leaving the house unaccompanied.  The ALJ

6    provided two reasons for rejecting Ms. Mendoza's report.  AR 31.  First, the ALJ noted that Ms.

7    Mendoza "alleges that the claimant is going blind in his left eye," which was not supported by the

8    record.  AR 31.  Second, the ALJ noted that Ms. Mendoza "has a personal interest in the

9    claimant's case, and is acting as kind of 'advocate'…."  *Id.*

10           Petitioners argue that the ALJ's rejection of Ms. Mendoza's function report based on the

11   fact she is Mendoza's mother has already been rejected.  In *Smolen*, the Ninth Circuit wrote:

12                   The first reason the ALJ gave for doing so was that the testimony
                     was from "family witnesses" who were therefore "understandably
13                   advocates, and biased." This amounted to a wholesale dismissal of
                     the testimony of all the witnesses as a group and therefore does not
14                   qualify as a reason germane to each individual who testified.
                     Moreover, the same could be said of any family member who
15                   testified in any case. The fact that a lay witness is a family member
                     cannot be a ground for rejecting his or her testimony.
16
     *Smolen*, 80 F.3d at 1289.

17           The *Smolen* court rejected the ALJ's reasoning because "[t]he fact that a lay witness is a

18   family member cannot be a ground for rejecting his or her testimony."  *Smolen*, 80 F.3d at 1289.

19   In this case, however, the ALJ did not reject Ms. Mendoza's opinion because of her status as

20   Mendoza's mother.  Rather, the ALJ specifically noted that Ms. Mendoza "has a personal interest

21   in the claimant's case, and is acting as kind of 'advocate'…."  AR 31.  Since his divorce in 2006,

22   Mendoza lived with his mother and was cared for her in almost every respect.  Ms. Mendoza

23   would clearly benefit from any award of benefits, and therefore, had a "personal interest in the

24   claimant's case."  *Id.*; *see Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (the ALJ

25   properly considered the girlfriend's "close relationship" with the claimant and that she was

26   "possibly influenced by her desire to help [him]").  In any event, the ALJ also noted that Ms.

27   Mendoza cited medical conditions (loss of eye sight) that were not supported by the record, and

28

1    Petitioners do not raise any issue with this reasoning.  Accordingly, the ALJ properly considered

2    the function report provided by Ms. Mendoza.

3         **C.    Whether the ALJ Considered All of Mendoza's Impairments when
             Determining Mendoza's RFC for Sedentary Work**
4
5         When determining a claimant's RFC, the ALJ must consider all of the claimant's

6    medically determinable impairments, including those that are not severe.  20 C.F.R. §

7    404.1545(a)(2), 416.945(a)(2).  Petitioners contend that the ALJ failed to include Mendoza's

8    diabetes or his psychiatric condition when determining the RFC.

9         As for Mendoza's diagnosis for secondary diabetes mellitus, there is no evidence showing

10   that this impairment caused any limitation of Mendoza's abilities.  A RFC is defined as "the most

11   you can still do despite your *limitations*."  20 C.F.R. § 404.1545(a)(1), § 416.945(a)(1) (emphasis

12   added).  There are no medical records indicating any resulting limitation from this impairment.

13   Nor did Mendoza testify to any.  Indeed, when asked about his diabetes, Mendoza testified that he

14   had it "under control," and that was the end of the discussion.  AR 84.  Because there is no

15   evidence that Mendoza's diabetes caused any limitations in Mendoza's abilities, the ALJ did not

16   err by not considering this impairment in the RFC determination.

17        With respect to Mendoza's psychiatric condition, this impairment *was* considered by the

18   ALJ when determining the RFC.  *See* AR 30-31.  To the extent Petitioners argue that the ALJ gave

19   insufficient weight to the evidence relating to Mendoza's psychiatric condition, the Court

20   addresses this in the next section.

21        **D.    Whether the ALJ Erred in Rejecting RFC Opinions from Mendoza's Treating
             Physicians Dr. Wahl and Dr. Blatt**
22
23        In finding that Mendoza had an RFC to do sedentary work, and therefore, was not disabled

24   within the meaning of the Social Security Act, the ALJ rejected the opinions of both Mendoza's

     treating physicians, Dr. Wahl and Dr. Blatt.  Petitioners contend the ALJ did so in error.
25
26        There are three types of medical opinions which can support the ALJ's RFC finding that

27   Mendoza was capable of the full range of sedentary work: those from treating physicians,

     examining physicians, and non-examining physicians who review the claimant's medical records.
28

United States District Court
Northern District of California

14

*Lester v. Charter*, 81 F.3d 821, 830 (9th Cir. 1995).  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Id*. (citations omitted).  If the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it should be accorded "controlling weight."  20 C.F.R. § 404.1527(c)(2).

Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Lester*, 81 F.3d. at 830 (quoting *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir. 1983)).  "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citations omitted).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Id*.  (citing *Embrey v. Bowen,* 849 F.2d 418, 421–22 (9th Cir. 1988)).

Moreover, the Ninth Circuit has held that "[t]he opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)).  Rejecting the opinion of a treating physician may, however, be based in part on the testimony of a non-examining medical consultant, when consistent with other independent evidence in the record.  *Morgan*, 169 F.3d at 602.  Generally, "[t]he weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.' "  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1201 (9th Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(3)).

### 1.    Dr. Wahl

In finding that Mendoza had a RFC for sedentary work, the ALJ relied heavily on the opinions of medical consultants who reviewed Mendoza's medical records and found that he was not disabled due to any physical impairments.  On August 24, 2007, a physician reviewed

1    Mendoza's medical records from 2005 through 2007 and concluded that Mendoza could do light

2    work.  AR 236-37.  On April 5, 2010, Dr. Quint completed an RFC assessment and concluded,

3    based on review of Mendoza's medical records until that time, that Mendoza was capable of

4    medium work with light balancing.  AR 333-37.  On April 19, 2010, R. Paxton M.D. agreed with

5    Dr. Quint's assessment of Mendoza's RFC.  AR 330-32.  These opinions contradicted Dr. Wahl's

6    RFC opinion, which indicated that Mendoza was capable of less than a sedentary RFC.

7         Dr. Wahl completed RFC questionnaires on May 25, 2010 and May 10, 2011.  The First

8    RFC questionnaire corresponds to the time period starting on November 4, 2005, and the second

9    corresponds to the time period starting on June 14, 2010.  In both RFC questionnaires, Dr. Wahl

10   opined that Plaintiff could sit without interruption only for one hour, and that in an 8-hour

11   workday, Mendoza could sit for less than two hours and stand/walk for less than two hours.  AR

12   340-41, 445-46.  Dr. Wahl also wrote that Mendoza could stand for one hour in the 2010 RFC, but

13   this was reduced to 15-20 minutes in the 2011 RFC.  AR 341, 446.  In both RFCs, Dr. Wahl wrote

14   that in any job, Mendoza would require the option to sit or stand at will, would have to take

15   unscheduled breaks, and would be absent from work more than four days per month as a result of

16   his impairments.  *Id*. at 342-43.

17        Even though Dr. Wahl's opinion that Mendoza was capable of less than a sedentary

18   position contradicted the opinions of these other physicians, the ALJ could not reject Mendoza's

19   treating physician's opinion "without providing specific and legitimate reasons' supported by

20   substantial evidence in the record for so doing."  *Lester*, 81 F3d. at 830 (citations omitted).  The

21   ALJ provided two reasons for rejecting the RFC opinion of Dr. Wahl.  First, the ALJ wrote that

22   Dr. Wahl's RFC opinion did "not correspond with his own treatment notes, … where the only

23   limitation he put on claimant was in regard to heavy lifting, and twisting."  AR 31.  Second, the

24   ALJ that Dr. Wahl "apparently relied quite heavily on the subjective report of symptoms and

25   limitations provided by claimant, and seemed to uncritically accept as true most, if not all, of what

26   the claimant reported."  AR 31.

27        As discussed above, there was no error in the ALJ's finding that Mendoza's subjective

28   complaints of pain were not entirely credible.  "A physician's opinion of disability premised to a

1    large extent upon the claimant's own accounts of his symptoms and limitations may be

2    disregarded where those complaints have been properly discounted." *Morgan v. Comm'r of Soc.*

3    *Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotations omitted).  Nevertheless, it is

4    unclear what aspects of Dr. Wahl's RFC opinion the ALJ believed existed solely because of

5    Mendoza's subjective complaints.  Dr. Wahl made his own objective findings over the course of

6    his five years of treating Mendoza, consistently reporting that Mendoza had moderate restrictions

7    in flexion.  *See* AR AR 238-63, 427-34.  Dr. Wahl also made specific findings in his RFC which

8    do not appear to originate from Mendoza's complaints, such as Dr. Wahl's estimation that

9    Mendoza would miss four days of work per month due to his impairments.

10          The ALJ also discounted Dr. Wahl's RFC opinion because the ALJ believed it was

11   inconsistent with Dr. Wahl's own treatment notes.  The ALJ's conclusion is not supported by the

12   evidence.  The ALJ was correct to observe that Dr. Wahl consistently limited Mendoza from

13   heavy lifting, bending and twisting.  Nevertheless, Dr. Wahl also at times indicated what he

14   believed to be the extent of Mendoza's limitations.  In November 2008, for instance, Dr. Wahl

15   wrote that Mendoza "would be disabled for any work activities," as Mendoza complained that he

16   was "only able to walk perhaps one block and has to sit down because of his pain."  AR 241.  Dr.

17   Wahl continued to treat Mendoza after November 2008 through at least February 2011, and Dr.

18   Wahl's treatment notes during this time do not indicate any improvement in Mendoza's back

19   condition.  AR 238-40, 427-434.  Rather, Dr. Wahl consistently indicated that Mendoza's back

20   pain continued without improvement, and noted in June 2010 that Mendoza began to complain of

21   pain in his left leg, which would often "buckle."  AR 431.

22          The ALJ is responsible for identifying "conflicting clinical evidence, stating his

23   interpretation thereof, and making findings."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.

24   1998) (citations omitted).  The ALJ failed to acknowledge the ways in which Dr. Wahl's treatment

25   notes were consistent with his RFC opinion, and thus failed to consider evidence which tends to

26   support Dr. Wahl's RFC opinion.  The ALJ also failed to identify clearly the opinion evidence

27   from Dr. Wahl which he believed depended entirely on Mendoza's subjective complaints.

28   Accordingly, the ALJ failed to offer "specific and legitimate reasons supported by substantial

United States District Court
Northern District of California

17

1    evidence" for rejecting the opinions of Dr. Wahl.   *Lester*, 81 F3d. at 830.

2              **2.    Dr. Blatt**

3              The ALJ also gave "very little weight" to the opinion of Dr. Blatt, who opined that

4    Mendoza was unfit to work from a psychological perspective beginning June 14, 2010.  AR 440.

5    The ALJ wrote that "Dr. Blatt's opinions contrast sharply with the other evidence of record," but

6    failed to specify what that evidence was.  *See* AR 31.  At another point in the opinion, the ALJ

7    mentioned that she would give "great weight" to the opinion of Dr. Scaramozzino, *see* AR 27,

8    who did psychiatric evaluation of Mendoza in August 2009.  *See* AR 284-88.  The ALJ also gave

9    "great weight" to two doctors who reviewed Mendoza's medical records in June and September

10   2009 and indicated that Mendoza's mental condition was not severe.

11             The ALJ failed to provide any reasons to discredit the opinion of Dr. Blatt.  The Ninth

12   Circuit has clearly held that "[t]he ALJ must do more than offer his conclusions.  He must set forth

13   his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v.*

14   *Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  In this case, the ALJ clearly failed to provide any

15   specific reason why she was discrediting Dr. Blatt's opinion.  To say that Dr. Blatt's opinion

16   "contrasts sharply" with the other medical evidence, without discussing what that evidence was,

17   constitutes legal error.  *See id.*

18             Indeed, the Court can find no evidence in the record that contradicts Dr. Blatt's RFC

19   opinion.  Dr. Blatt completed the RFC on April 11, 2011, and noted the earliest date the

20   limitations applied was June 14, 2010−the day he met Mendoza.  AR 440.  There is no other

21   evidence regarding Mendoza's mental condition from this time period.  The psychiatric evaluation

22   completed by Dr. Scaramozzino in August 2009, which suggested that Mendoza was mildly

23   depressed due to his back condition, does not contradict Dr. Blatt's assessment (after 10 months of

24   treatment) that Mendoza had a major psychiatric disorder−either bipolar syndrome or major

25   depression.  Nor do the reviews from Dr. Nawar or Dr. Goldberg (from June and September of

26   2009) say anything about Mendoza's psychiatric condition in 2010.  Evidence that Mendoza had

27   mild mental impairment in 2009 does not contradict Dr. Blatt's opinion that Mendoza was

28   incapable of sedentary work after June 14, 2010.  Because no other physician's opinion spoke to

United States District Court
Northern District of California

18

1   the period, Dr. Blatt's opinion should be accorded "controlling weight" for the period beginning

2   on June 14, 2010.  20 C.F.R. § 404.1527(c)(2).

3        The ALJ may have also given less weight to Dr. Blatt's RFC opinion because she believed

4   Dr. Blatt acted as an "advocate" for Mendoza.  *See* AR 31.  The ALJ noted that Dr. Blatt

5   recommended that Mendoza read the book, *Four Agreements*, and also counseled him on his child

6   custody issues.  AR 31.  To the extent the ALJ discounted the opinion of Dr. Blatt for these

7   reasons, she did so in error.  Dr. Blatt is a psychiatrist who held regular sessions with Mendoza for

8   several months.  The fact Dr. Blatt recommended a self-help book for Mendoza and discussed his

9   child custody issues−which clearly contributed to Mendoza's poor psychological state−does not

10  render him an "advocate" who was improperly biased.  It merely shows that he did his job.

11  Indeed, the fact Dr. Blatt threatened to stop treating Mendoza due to his inability to follow the

12  treatment plan shows that he was not an "advocate" for Mendoza.

13       **E.     Whether the Case should be Remanded for Further Administrative**
         **Proceedings or an Immediate Award of Benefits**
14

15       Having found that the ALJ erred in rejecting the opinions of Dr. Wahl and Dr. Blatt

16  without sufficient explanation, the next question is whether the case should be remanded for an

17  immediate award of benefits or for additional administrative proceedings.  "Remand for further

18  administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*

19  *v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th

20  Cir. 2000)).  "Conversely, where the record has been developed fully and further administrative

21  proceedings would serve no useful purpose, the district court should remand for an immediate

22  award of benefits." *Id*.  Specifically, the Court "should credit evidence that was rejected during

23  the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to

24  provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues

25  that must be resolved before a determination of disability can be made; and (3) it is clear from the

26  record that the ALJ would be required to find the claimant disabled were such evidence credited."

27  *Id*. (citations omitted).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1     These three requirements are satisfied when the period of disability is limited from June

2  14, 2010 to the time of Mendoza's death on July 12, 2012.  Dr. Blatt put Mendoza at a sedentary

3  RFC starting on June 14, 2010, the first day he saw Mendoza.  As discussed above, the ALJ failed

4  to provide legally sufficient reasons for rejecting the opinion of Dr. Blatt.  No medical evidence

5  contradicts Dr. Blatt's assessment during this time that Mendoza was disabled.  Accordingly, Dr.

6  Blatt's opinion is entitled to "controlling weight," and thus "it is clear from the record that the ALJ

7  would be required to find the claimant disabled were such evidence credited." *Id*.  Finally, no

8  outstanding issues must be resolved prior to determining that Mendoza was disabled after June 14,

9  2010.  The vocational expert's testimony at Mendoza's hearing establishes that, when

10 incorporating Dr. Wahl's and just one of Dr. Blatt's limitations, there were insufficient jobs

11 available which Mendoza could perform.  *See* AR 86.  There is also no evidence that Mendoza

12 was drinking alcohol during this time.  Accordingly, the ALJ failed to meet her burden at step five

13 to show that Mendoza could perform other work, which renders Mendoza disabled and entitled

14 him to benefits after June 14, 2010.

15     By contrast, even if the Court credits Dr. Wahl's opinion that put Mendoza at less than a

16 sedentary RFC before June 14, 2010, it is unclear whether Mendoza was disabled prior to this

17 date.  "In 1996, Congress amended the Social Security Act to preclude an award of disability

18 benefits if drug or alcohol abuse is 'a contributing factor material to the Commissioner's

19 determination that the individual is disabled.' " *Parra v. Astrue*, 481 F.3d 742, 744-45 (9th Cir.

20 2007) (quoting 42 U.S.C. § 423(d)(2)(C)).  It is the claimant's burden to show that "his substance

21 abuse is not a material contributing factor to his disability." *Id.* at 744-45.  The ALJ must consider

22 whether the disability determination "would remain if [the claimant] stopped using drugs or

23 alcohol and then determining whether any or all of [the claimant's] remaining limitations would be

24 disabling." 20 C.F.R. § 404.1535(b)(2).

25     In this case, the ALJ never explicitly considered the effect of Mendoza's alcohol addiction

26 during the disability period.  Nevertheless, the ALJ wrote that "the claimant's allegations of pain

27 and depression overlapped significantly with his alcohol addiction," *see* AR 27, thus indicating

28 that Mendoza's history of alcohol addiction would have contributed to the ultimate disability

determination.  Mendoza reported that he stopped drinking at least by the beginning of 2010 after his hospitalization, and the evidence does not show that he drank alcohol after this time.  Accordingly, the case should be remanded for the Commissioner to determine whether Mendoza passed step five of the sequential analysis at any time before June 14, 2010, and if so, whether his alcoholism was a "material contributing factor to his disability."  *Parra v. Astrue*, 481 F.3d at 744-45.

**V.    CONCLUSION**

For the foregoing reasons, Petitioners' Motion for Summary Judgment is GRANTED and the Commissioner's Motion for Summary Judgment is DENIED.  The case shall be remanded to the Commissioner for an award of benefits corresponding to the limited period from June 14, 2010 to July 12, 2012.  Further administrative proceedings shall be held to determine whether the claimant is entitled to additional benefits corresponding to any time prior to June 14, 2010.

**IT IS SO ORDERED.**

Dated: April 11, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge